THE ALICE M. MINOT.

·DENMEAD and others *v.* THE ALICE M. MINOT.

(*District Court, E. D. Virginia.* February 1, 1887.)

SALVAGE—FIRE—TOWAGE—AWARD.

On November 11, 1886, fire was discovered in the hold of a cotton vessel loading at the wharf at West Point, Virginia. A tug went to her, and towed her away from the wharf into deeper water, where she was sunk by her crew, and the fire thus extinguished. The service was not attended with any danger to the tug or her crew. The value of the vessel and cargo in their damaged state was $72,000. The court awarded $500 as salvage.

(*Syllabus by the Court.*)

In Admiralty. Libel for salvage.

*James Lyons Proctor*, for salvors.

*W. T. Bagby*, for respondent.

HUGHES, J. On the eleventh day of November, 1886, about 5 P. M., while the American ship Alice M. Minot was taking on a cargo of cotton at the wharf at West Point, Virginia, and had received 1,834 bales, worth $73,360, it was found that her cargo was on fire down in the hold. Considerable smoke came up from the fire, and disclosed its dangerous character. Experience has taught that a smothered fire in a mass of cotton bales stored in the hold of a vessel is rarely extinguishable in any other way than by sinking the ship up to her decks in water. All the appliances in the nature of hose and engines available on the dock and on the vessel at the time were used in an attempt to extinguish the fire, and proved ineffectual. It is not shown satisfactorily that the water was deep enough where the ship lay by the side of the dock to admit of her being scuttled and sunk at that spot; and the person who had command of her, (in the absence of her master, who was in Norfolk,) for reasons satisfactory to himself, deemed it necessary that the ship should be towed off from the dock into water of suitable depth, and sunk there. The steam-tug Claribel belonging to the libelant was lying off the dock. The steamer Baltimore, with cargo and passengers on board, bound for Baltimore, ready to depart on her regular trip, was also there about to leave. She was not called upon to tow the ship out into the harbor, and went on her way. As soon as the master of the Claribel saw that the steamer Baltimore was gone or going, he went from the wharf to his tug to bring her to the relief of the ship on fire. When he reached his vessel, he found that the person temporarily in command of the ship had sent word for his tug to come to her relief. Although he was not fully fired up, the master went at once to the ship. He then took hold of the ship, and towed her out into the channel to a place deemed proper by the temporary master of the ship. She was there sunk, having been previously scuttled by those on board of her, including her own crew. The ship was worth about $24,000 and was saved. The cargo, in dam-

aged condition, has been sold for $47,684. The evidence does not show that the ship was much damaged. She afterwards took on a cargo, and set sail for Liverpool.

The ship and cargo were raised the next day by the tug and its crew, under a special contract, with which I have nothing to do in considering the question of salvage. I think this was a case of salvage. The master of the tug was under no other than strong moral obligation to go to the relief of the ship. He was under no legal one. His was the only vessel in port at the time he went that was capable of rendering the service needed. He had determined to go to the ship's relief of his own accord. When about to do so, he got word from the ship, calling him to her rescue. The service which he rendered was not attended by any danger to his tug or her crew, and the service had not that important element of merit and value in it which often belongs to salvage service. But the service was absolutely necessary. The sinking of the ship by the side of the wharf covered with vast stores of cotton, towards which the wind was blowing from the ship, was not to be thought of. Nobody thought of it at the time. To have sunk the ship there would have been a criminal act of reckless indifference to the large interests of life and property that would have been put in jeopardy. The court will not listen to the suggestion that the ship could have been scuttled at the side of the dock, or consider whether the water there was deep enough for the purpose; which the evidence tends to show that it was not. Those in charge of the ship properly determined that it was necessary that she should be towed, not only out into the channel, but a prudent distance up the channel. The tug was not bound, except morally, to perform this service. She was about to do it without request, when she was called upon from the ship to do it; and she did it voluntarily. When a ship is saved from impending peril by the voluntary service of those coming to her aid, that is salvage service.

Circumstances of risk, daring, expense, and difficulty render the service of high or low grade; but in all cases where the service is of the character of salvage, the courts award a bounty willingly and not grudgingly. I would not be justified, however, in making the bounty a heavy one in this case. The value saved was about $72,000; but this is not a case for a proportion or a percentage. I think $500 would be a liberal allowance for the service rendered in towing the ship into and up the channel to the place of safety where she was scuttled and sunk, and where she was relieved of the peril of the fire which would, but for this service, have consumed herself and her cargo. I will sign a decree for this $500, and for the amount due for raising the ship indicated by the special contract that was made for that service.